UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

WILLIAM R. GRENDER,

    Plaintiff,

v.                                                      Case No. 15-CV-0086

EDWARD F. WALL, et al.,

    Defendants.

**DECISION AND ORDER**

      Plaintiff William R. Grender, a state prisoner serving a sentence, filed this pro se civil rights action under 42 U.S.C. § 1983 alleging that his constitutional rights were violated while he was housed at Green Bay Correctional Institution (GBCI). The case was allowed to proceed on multiple conditions of confinement claims regarding his time in the GBCI Restrictive Housing building. Plaintiff claims that the conditions in segregation caused him both physical and mental harm. He was also allowed to proceed on a medical claim relating to the nursing staff in response to his claims of Helicobacter pylori (H. pylori) and migraine headaches. This Court also allowed him to proceed on a retaliation claim against a correctional officer. This case is now before the Court on Plaintiff's motion for summary judgment and Defendants' motion for summary judgment. Plaintiff's motion for reconsideration of this Court's order denying his previous motion to appoint an expert witness is also pending. For the reasons that follow, Plaintiff's motions will be denied and Defendants' motion will be granted.

**BACKGROUND**

During all times relevant to the facts of this action Plaintiff William R. Grender was incarcerated at Green Bay Correctional Institution (GBCI) in the Restrictive Housing Unit.[1] Each of the twelve defendants were employees of the Wisconsin Department of Corrections (DOC) during all times relevant to the facts of this suit. Edward Wall was Secretary of the DOC and Lori Alsum was a nursing coordinator with the DOC Bureau of Health Services in Madison. Each of the remaining defendants worked at GBCI for the relevant period. Brian Foster was the warden of GBCI; Cathy Francois was the corrections program supervisor; Ryan Bauman was a captain; Jay Van Lanen was a lieutenant; Michael Prebeg was a sergeant; Toa Chue Feng Vang, Edward Paul, and Wesley Bebo were officers; and Jean Lutsey and Kathy Lemens were nurses.

Plaintiff was first housed in Restrictive Housing between August 23, 2013 and January 16, 2014. The record is silent as to the reason for his initial placement in Restrictive Housing. Plaintiff was placed in Restrictive Housing again from July 21, 2014 to February 6, 2015 for charging and repeatedly punching another inmate. Throughout the attack Plaintiff continued striking the victim despite orders from a correctional officer to stop, requiring officers to use force to restrain Plaintiff. Restrictive Housing is a punitive status and inmates in Restrictive Housing are subject to certain limitations as described in the GBCI Segregation handbook. While in Restrictive Housing, Plaintiff was allowed four hours of out-of-cell time per week. He could choose to use this time by having a 2-hour period of outside recreation and a 2-hour law library session, or by having two, 2-hour

---

[1] Plaintiff objects that he was never housed in the Restrictive Housing Unit, claiming instead that he was housed in the Program Segregation Unit. It is undisputed, however, that "Restrictive Housing Unit" and "Program Segregation Unit" are two names for the same housing unit—Restrictive Housing Unit is simply the new name for the unit.

2

outside recreation sessions. Inmates may receive more recreation time through good behavior. Like all inmates in Restrictive Housing, Plaintiff ate all his meals in his cell. Pairs of officers delivered prepared meals to inmates in Restrictive Housing through traps in the cell doors.

All cells in Restrictive Housing are single-occupant cells. The cells are austere, equipped with a sink, toilet, light, concrete bed frame, mattress, pillow, window, radio jack, medical intercom system, shower, shower stall, drain, and small shelf/desk. The drain is located on the floor in the shower stall. The shower stall shares a concrete floor with the rest of the cell so that if the drain is clogged water pools on the floor of the cell. Inmates are given one shower per week. Showers are controlled externally by prison officials on each wing and are run for a single seven minute period.



Photograph 1. Francois Dec. Ex. 1012-002, Depiction of Restrictive Housing Cell, ECF No. 51-2.

3

The toilets in the cells are attached to a computerized Sloan Electronic System that regulates the number of times the toilet can be flushed over a certain period. After an inmate pushes the flush button on the toilet there is a timed delay before the toilet actually flushes. If an inmate attempts to flush the toilet three times in approximately two minutes or less the flushing system shuts down for approximately 15 minutes, at which time the system will reset and continue working. Inmates are given the opportunity to clean their own toilets once a week, with toilet brushes available upon request. The toilets are part of a stainless steel sink and toilet combination. The sink portion of the combination provides hot and cold water to inmates on demand.

Inmates in Restrictive Housing have individual control over the lighting in their cell. Each cell's light has two settings: high and low. If an inmate turns his light switch to "off," the low setting is activated. The low setting consists of a 5-watt light behind a cloudy or frosted cover. There is no way for inmates in Restrictive Housing to completely shut off their lights. As such, the cells are illuminated 24 hours a day, seven days a week. Prison officers are also equipped with flashlights that may be used to shine inside the cells to see the prisoner. The GBCI commissary sells sleep masks that inmates are allowed to use to cover their eyes at night. Though inmates are allowed to use a towel to cover their eyes to block out the light, inmates may not fully cover their faces.

Bedding is provided to inmates in Restrictive Housing. The mattresses and pillows are made at GBCI in the Badger State Industries facility. The mattresses are made of foam and are covered with a vinyl cover. Misbehaving inmates may have their mattress removed and replaced with a black, heavy-weight and harder, security mattress. Mattresses can be removed from the bed, exposing the concrete bedframe below.

4

### A. Events of September 18, 2014

September 18, 2014, was a shower day in Restrictive Housing. The parties have different versions of what happened on that day but some of the facts are uncontested. Plaintiff's mattress, like many of the mattresses in Restrictive Housing, was quite worn. Somehow, Plaintiff's mattress got wet during or after the showering period. Plaintiff alleges that he slipped while changing his bed and dropped his mattress into water that accumulated on the floor because of a clogged drain. Officers Vang and Paul claim that they saw no water on the floor and that they could not verify that the mattress was wet. Regardless, after the shower period Plaintiff told Vang and Paul that he had accidentally gotten his mattress wet and requested a new mattress. Plaintiff was given a towel to dry off his mattress. Defendants claim that Paul and Vang asked Sgt. Prebeg for a mattress for Plaintiff, but that Prebeg was unable to find one. The parties dispute whether Plaintiff was given a mattress by the end of Prebeg's shift. Plaintiff alleges that he was forced to sleep on a wet mattress the night of September 18, 2014, causing him to develop a rash and irritation on the neck, back, and upper buttocks. The parties agree that Plaintiff's mattress was replaced by September 19, 2014. The parties dispute whether Plaintiff's mattress was replaced because it was wet or because it was worn.

### B. Plaintiff's Complaints

In August 2014, Plaintiff sent letters to a number of DOC officials, including Secretary Wall, requesting an investigation into the conditions of confinement in the Restrictive Housing Unit at GBCI. Among the complaints were allegations relating to the Restrictive Housing Unit's recreation policy, 24-hour cell illumination policy, and the automated toilet flushing system. Plaintiff wrote that

5

the 24-hour illumination causes inmates to develop migraine headaches[2] and sleep disorders. He also complained that the automated toilet systems caused cells to be filled with fecal matter resulting in an epidemic of Helicobacter pylori (H. pylori).[3] Shortly after sending these letters Plaintiff began complaining to prison medical staff that he had symptoms consistent with H. pylori. Plaintiff's letter was forwarded to Warden Foster to prepare a response. Foster responded to Plaintiff that his concerns were noted and that he would continue to evaluate Plaintiff's complaints and GBCI's operations in Restrictive Housing. Plaintiff alleges that as a result of being in Restrictive Housing he suffered from stomach problems related to H. pylori, loss of weight, and loss of sleep from migraines and loud noises.

**C. Health Services Unit**

Plaintiff filed a request with the Health Services Unit (HSU) on August 27, 2014, complaining of stomach pains, stomach bloating, "gastestrial" problems, gas, and hunger. Nurse Lemens saw Plaintiff that same day. Lemens assessed Plaintiff and gave him over-the-counter medication for gassiness with instructions to return if his symptoms did not improve. Despite Plaintiff's demands he was not tested for H. pylori that day.

---

[2] Migraine is a common episodic disorder, the hallmark of which is a disabling headache generally associated with nausea, and/or light sound sensitivity. Mild to moderate migraine attacks are ordinarily treated with over the counter pain medications. Sauvey Dec. ¶¶ 23, 24, ECF No. 58.

[3] H. pylori is a common bacterium that can be found in the stomach and causes ulcers. The parties agree that conservative estimates suggest that half of the world's population is infected with H. pylori. The route by which H. pylori infection occurs remains unknown. The risk of acquiring H. pylori infection is related to socioeconomic status and living conditions early in life. Factors such as density of housing, overcrowding, number of siblings, and lack of running water have all been linked to a higher acquisition rate of H. pylori infection. Person-to-person transmission through either fecal/oral or oral/oral exposure seems most likely. The majority of people with H. pylori infections are asymptomatic. Sauvey Dec. ¶¶ 13–19, ECF No. 58.

The next day, August 28, 2014, Plaintiff made a request to HSU complaining of migraine headaches and lack of sleep caused by constant illumination and loud noises. Though the nursing staff attempted to see Plaintiff that same day, Plaintiff refused to be seen. Plaintiff made a similar request to the HSU on September 2, 2014. After an assessment, Nurse Lemens gave him acetaminophen, recommending that he request an eye examination, drink more water, and return in two weeks if his symptoms did not improve.

On September 17, 2014, Plaintiff submitted an additional request to the HSU asking to be tested by a doctor for H. pylori. The nursing staff responded that he was scheduled to see a doctor in two to three weeks. Plaintiff was seen by GBCI Physician Dr. Sauvey on September 26, 2014. Based on Plaintiff's symptoms, Dr. Sauvey ordered a test for H. pylori. It is undisputed by the parties that to the extent Grender was having symptoms caused by H. pylori at that time, the medication Ranitidine would have helped alleviate those symptoms.

On October 21, 2014, Plaintiff again filed a request with the HSU complaining of migraines and related symptoms. The HSU scheduled Plaintiff to see a doctor and on October 24, 2014, Plaintiff was again seen by Dr. Sauvey. During the appointment Dr. Sauvey switched Plaintiff's H. pylori medication due to adverse side effects and informed Plaintiff of that he tested positive for H. pylori. This result did not mean that Plaintiff had an active H. pylori infection, only that he had the infection at some point. Additional testing would be needed to determine if he had an active infection. These were considered routine tests as H. pylori is not an urgent condition. Dr. Sauvey also approved Plaintiff's acetaminophen use and ordered a follow-up. By December 17, 2014, Dr. Sauvey noted that Plaintiff's follow-up tests were positive for H. pylori. Dr. Sauvey observed that

when she was treating Plaintiff between September 2014 and January 2015, Plaintiff's weight remained the same, around 160 pounds.

**D. Interactions With Officer Bebo**

The parties dispute most of the facts surrounding Plaintiff's interactions with Officer Bebo. On November 23, 2014, Defendants Paul and Bebo were distributing meal trays in Plaintiff's building. Plaintiff contends that Bebo threatened to wrongfully write Plaintiff up in retaliation for a previous complaint Plaintiff had filed. Bebo then proceeded to spill milk from Plaintiff's tray on himself and wrongfully wrote conduct reports about Plaintiff for the event. Additionally, Plaintiff alleges that Bebo provided Plaintiff with extra pills in order to challenge the sincerity of Plaintiff's suicide threats. Plaintiff alleges that these actions were taken in order to retaliate against Plaintiff for filing complaints against Bebo and prevent Plaintiff from filing future complaints.

**ANALYSIS**

**A. Summary Judgment Standard**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460–61 (E.D. Wis.1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a motion for summary judgment, the court will view the facts in the light most favorable to the non-moving parties. *Crull v. Sunderman*, 384 F.3d 453, 460 (7th Cir. 2004).

**B. Conditions of Confinement**

**1. Legal Standard**

The Eighth Amendment prohibition of cruel and unusual punishment applies to the states through the Due Process Clause of the Fourteenth Amendment. *Gillis v. Litscher*, 468 F.3d 488, 491 (7th Cir. 2006) (citing *Robinson v. California*, 370 U.S. 660 (1962)). Courts must follow a two step process when analyzing an Eighth Amendment conditions of confinement claim:

> First, we must determine whether the conditions at issue were "sufficiently serious" so that a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities. If the inmate successfully establishes that the conditions were sufficiently serious, we then examine whether prison officials acted with "deliberate indifference" to the conditions in question. "Deliberate indifference," in turn, means that the official knew that the inmate faced a substantial risk of serious harm, and yet disregarded that risk by failing to take reasonable measures to address it.

*Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (internal citations and quotations omitted). The Eighth Amendment imposes a duty on prison officials to ensure that prisoners are provided with adequate heat, clothing, sanitation, food, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Gillis*, 468 F.3d at 493. However, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "Some conditions of confinement may establish an Eighth Amendment violation in combination when each alone would not do so." *Gillis*, 468 F.3d at 493.

**2. Restrictive Housing Conditions**

*24-Hour Illumination*

Plaintiff contends that 24-hour lighting with a 5-watt fluorescent bulb in his Restrictive Housing Cell constitutes an extreme deprivation because it caused him migraines and sleep

9

deprivation. He argues that Defendants were deliberately indifferent because he complained about the lighting and they failed to respond by reducing the bulb wattage, providing him a sleeping mask, or shutting the lights off entirely. Plaintiff alleges that any security concerns could have been resolved by shining prison officers' flashlights into the cell at night.

I find that 24-hour illumination with a 5-watt bulb was not an "extreme deprivation" that denied Plaintiff "the minimal civilized measure of life's necessities." *Hudson*, 503 U.S. at 9; *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The low setting on the Restrictive Housing Unit cell's lights is akin to a nightlight or perhaps a small open window into an bright hallway. It is not sufficient that this situation may have caused Plaintiff some discomfort and that Plaintiff may have preferred to sleep in total darkness. *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997) ("Prison conditions may be harsh and uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment."). Furthermore, Plaintiff had the opportunity to cover his eyes at night with a towel and he used his shirt for that very purpose. Sleep masks were also available in the prison commissary.

Other courts have found that harsher lighting conditions were not an objectively serious deprivation. For example, in *Vasquez v. Frank* the Seventh Circuit held that "24-hour lighting involving a single, 9-watt fluorescent bulb does not constitute an objectively 'extreme deprivation.'" 290 F. App'x 927, 929 (7th Cir. 2008). As such, constant illumination with a 5-watt bulb necessarily fails to rise to the level of an Eighth Amendment violation. *See also Wills v. Terhune*, 404 F. Supp. 2d 1226, 1231 (E.D. Cal. 2005) (holding that a plaintiff is not likely to succeed on the merits of his claim that constant illumination with a 13-watt bulb was a serious deprivation).

10

Plaintiff cannot salvage his 24-hour illumination claim through reliance on *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996), *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998). In *Keenan* the court held that 24-hour illumination created a disputed issue of material fact on an Eighth Amendment claim where the inmate's cell was constantly illuminated by large florescent lights shining in front of and behind his cell such that he "had no way of telling night or day." *Id*. at 1090–91. Such extreme lighting conditions are readily distinguishable from the facts of the present case, where Plaintiff had only a dim light in his cell.

Additionally, Plaintiff does not challenge Defendants' argument that they were not deliberately indifferent with regard to his 24-hour illumination complaints. Therefore, he has waived any opposition to this argument and Defendants are alternatively entitled to summary judgment due to Plaintiff's failure to show deliberate indifference. *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (holding that failure to respond to arguments for summary judgment constitutes waiver); *see Townsend*, 522 F.3d at 773 (noting that Eighth Amendment conditions of confinement claims require a showing of deliberate indifference).

*Electronic Toilet Flushing System*

Plaintiff argues that the prison delay flush system amounts to an extreme deprivation. As with the constant illumination issue, Plaintiff failed to challenge Defendants' argument that they were not deliberately indifferent with respect to the toilet flushing system. Therefore, Defendants are also entitled to summary judgment on this issue. *Laborers' Int'l Union of N. Am.*, 197 F.3d at 1197; *Townsend*, 522 F.3d at 773.

Alternatively, Defendants are entitled to summary judgment on this issue because any harm caused to Plaintiff by the toilet system is based on mere speculation. *Amadio v. Ford Motor Co.*,

11

238 F.3d 919, 927 (7th Cir. 2001) ("It is well-settled that speculation may not be used to manufacture a genuine issue of fact."). Plaintiff argues that it is "conceivable . . . that the delay flushing system on the toilets in the segregation unit causes some build-up of human waste that goes air bourne contaminating food, toothbrushes, towels and the likes that is ingested and contributed to H. pylori." Pl.'s Br. In Opp. and Pl.'s Reply Br. In Supp. 10, ECF No. 69. In support of this argument he quotes Dr. Sauvey's testimony that "[t]he route by which H. pylori infection occurs remains unknown. Person-to-person transmission through either fecal/oral or oral/oral exposure seems most likely." Sauvey Dec. ¶ 17, ECF No. 58. This evidence is plainly insufficient to prove (beyond mere speculation) that Plaintiff contracted H. pylori because of the toilet flushing system. Indeed, as Dr. Sauvey said, the cause of the infection remains "unknown." Furthermore, no one else used Plaintiff's toilet so he could not have contracted the infection from it.

Plaintiff has also failed to show that the delayed flush system is an extreme deprivation. Numerous other cases have held that similar or more egregious circumstances did not rise to the level of an extreme deprivation. *See, e.g.*, *Boyd v. Davis*, 234 F.3d 1272 (7th Cir. 2000) (table), 2000 WL 1071644 *2 ; *Smith v. Gasparini*, No. 94-C-50160, 1997 WL 715688 *4 (N.D. Ill. Nov. 10, 1997); *Sanchez v. Walker*, No. 09-C-2289, 2010 WL 5313815, *9–10 (N.D. Ill. Dec. 17, 2010); *Robinson v. Illinois State Correctional Center (Stateville) Warden*, 890 F.Supp. 715, 720 (N.D. Ill. 1995). Therefore, Defendants are entitled to summary judgment on the alternative ground that Plaintiff has failed to offer evidence showing that the delayed toilet flushing system causes an extreme deprivation.

12

*Recreation Policy*

Plaintiff argues that the Restrictive Housing recreation policy rises to the level of an Eighth Amendment violation because he faced a risk of physical injury—though Plaintiff does not claim to have suffered any physical injury as a result of the policy. "Lack of exercise may rise to a constitutional violation in extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened." *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996).

Plaintiff's argument is undeveloped and ultimately fails. He spends the majority of his discussion about the recreation policy citing various legal authorities, culminating in a discussion of combined deprivations of life's necessities. Pl.'s Br. In Opp. and Pl.'s Reply Br. In Supp. 10, ECF No. 69. I will address this "combination" argument below but it appears that Plaintiff has abandoned his claim that the Restrictive Housing recreation policy alone violated the Eight Amendment. Even had he not abandoned his claim, Plaintiff's speculation about the risk of harm would be insufficient to state a claim. *Amadio*, 238 F.3d at 927. Therefore, Defendants are entitled to summary judgment on Plaintiff's recreation policy claim. As Plaintiff has been transferred to a different facility and GBCI has changed its recreation policy, any request for injunctive relief is denied as moot.

*Combination of Factors*

Plaintiff argues that the conditions of his confinement, when viewed collectively, rise to the level of an Eighth Amendment violation. As the Seventh Circuit stated in *Gillis v. Litscher*:

> Some conditions of confinement may establish an Eighth Amendment violation in combination when each alone would not do so. This is true when the deprivations have a mutually enforcing effect which produces the deprivation of a single, identifiable human need, such as food or warmth, for example "a low cell temperature at night combined with a failure to issue blankets."

13

468 F.3d 488, 493 (7th Cir. 2006) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)). The facts of this case do not give rise to such a concern. Each of Plaintiff's complaints address distinct human needs that do not have a "mutually enforcing effect." The lighting policy touches upon Plaintiff's need for sleep, the toilet flushing system potentially impacts Plaintiff's sanitation, and the recreation policy affects Plaintiff's need for exercise. Therefore, Defendants are entitled to summary judgment on Plaintiff's "combination" claim.

### 3. Personally Responsibility of Bauman and Van Lanen

Plaintiff must also show that each defendant was personally responsible for any alleged constitutional deprivation. *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003) ("Moreover, in order to recover damages against a state actor under § 1983, a plaintiff must show the actor was 'personally responsible for the constitutional deprivation.'") (quoting *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 614 (7th Cir.2002)). Plaintiff failed to show that Capt. Bauman and Lt. Van Lanen were personally responsible for the constitutional deprivation. Plaintiff does not dispute that Bauman and Van Lanen did not have authority to cure the alleged unconstitutional deprivations—he only argues that they could have made suggestions to those with authority. Such attenuated responsibility does not suffice for the purposes of showing personal responsibility under § 1983. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Public officials do not have a free-floating obligation to put things to rights. . . . Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job."). Therefore, Bauman and Van Lanen are entitled to summary judgment.

14

#### 4. Qualified Immunity

Defendants claim they are entitled to qualified immunity because the law was not clearly established that 24-hour cell illumination with a 5-watt bulb, an electronic toilet delayed flush system, or Restrictive Housing's recreation policy rise to the level of an Eighth Amendment violation. Plaintiff "has the burden of establishing that the constitutional right at issue was clearly established." *Estate of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir. 2010). As covered in the discussion of the merits above, Plaintiff has not shown that any of these conditions rise to the level of an Eighth Amendment violation. Therefore, the Defendants are entitled to qualified immunity on Plaintiff's conditions of confinement claims.

### C. Defendant Nurses

Plaintiff makes only a superficial attempt to oppose Defendants' arguments for summary judgment on the claims against the Defendant nurses. Specifically, Plaintiff failed to address Defendants' arguments that: (1) his H. pylori and migraines were not serious medical needs; (2) that Nurses Lutsey and Alsum lacked personal responsibility; and (3) that Lutsey, Alsum, and Lemens have qualified immunity. Therefore, he has waived any opposition to those arguments. *Laborers' Int'l Union of N. Am.*, 197 F.3d at 1197. As such, summary judgment will be granted for Defendants Lutsey, Alsum, and Lemens.

Furthermore, because the claims against the Defendant nurses will be dismissed, Plaintiff's request for a court appointed medical expert will be denied as moot. Plaintiff contends that he requires expert testimony to prove that these nurses violated published standards of care. But given Plaintiff's waiver, no "scientific, technical, or other specialized knowledge will assist the trier-of-fact to understand the evidence or decide a fact in issue" in this case. *Ledford v. Sullivan*, 105 F.3d 354,

15

358–59 (7th Cir. 1997); *see* Fed. R. Evid. 702(a); *Turner v. Cox*, 569 F. App'x 463, 468 (7th Cir. 2014) (holding that a district court did not err in refusing to appoint an expert for a pro se prisoner in a case involving H. pylori).

**D. Wet Mattress**

Plaintiff claims that the actions of Sgt. Prebeg, Officer Vang, and Officer Paul on September 18, 2014, violated his Eighth Amendment rights. Under Plaintiff's version of the facts, Defendants refused to give Plaintiff a new mattress (though they had one available) after Plaintiff slipped on his wet floor and dropped his mattress into the pooling water. According to Plaintiff, he was then forced to sleep on a wet mattress for a night, resulting in him getting a rash and skin irritation.

These facts fail to give rise to an Eighth Amendment violation. The Seventh Circuit has repeatedly held that worse sleeping conditions are not an extreme deprivation. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996) (finding that jail inmate's allegation that he was forced to sleep on the floor for one night due to overcrowded conditions fails to state a constitutional claim against jail officers); *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989) (holding that prison guard denying "requests for dry bedding and clothing forcing him to sleep on a 'slab of metal' for two and one-half days" does not rise to the level of a constitutional violation); *Stephens v. Cottey*, 145 F. App'x 179, 181 (7th Cir. 2005) (holding that being forced to sleep for three days on a metal bedframe without a mattress is not an extreme deprivation). Here, Plaintiff could have removed his mattress and slept on the concrete bedframe or slept on the floor. He still had his pillow, clothes, and other bedding. A single night under such conditions does not rise to the level of an Eighth Amendment violation.

16

Plaintiff's reliance on *Townsend v. Fuchs*, 522 F.3d 765 (7th Cir. 2008), is unavailing. In *Townsend* the inmate was allegedly forced to sleep on a wet, moldy, and foul smelling mattress for 59 days. *Id.* at 768. Plaintiff's single night on a wet mattress (with no mold or foul smell) is clearly distinguishable. Additionally, Plaintiff has waived his opposition to Defendants' arguments by failing to respond in his brief in opposition. Therefore, Defendants Prebeg, Vang, and Paul are entitled to summary judgment.

**E. Retaliation Claim as to Officer Bebo**

Plaintiff failed to respond to any of the arguments made by Defendants about Officer Bebo. Instead, he only writes cryptically that "[s]ummary judgment in favor of the defendants is not warranted where Bebo admits that he gave Grender pills but 'not intentionally.'" Pl.'s Br. In Opp. and Pl.'s Reply Br. In Supp. 20, ECF No. 69. This statement fails to respond to Defendants' arguments that: (1) Plaintiff failed to show that Bebo committed a retaliatory act because he engaged in protected First Amendment activity; (2) there is no admissible evidence that Bebo wrote Plaintiff conduct reports in retaliation for filing an inmate complaint relating to Officer Paul; (3) the conduct reports are supported by a legitimate correctional goal and Plaintiff would have received them regardless of any retaliatory motive; and (4) there is no evidence that Bebo's actions of giving Plaintiff extra medication was motivated by First Amendment Activity. Defs.' Br. In Supp. and Defs.' Br. In Opp. 39–44, ECF No. 43. Because Plaintiff failed to respond to these arguments Bebo is entitled to summary judgment. *Laborers' Int'l Union of N. Am.*, 197 F.3d at 1197.

## CONCLUSION

Based upon the foregoing analysis Defendants' motion for summary judgment (ECF No. 42) is **GRANTED** and Plaintiff's motion for summary judgment (ECF No. 31) is **DENIED** and this

17

action is **DISMISSED**. Plaintiff's motion for reconsideration of order denying motion to appoint an expert witness (ECF No. 64) is also **DENIED**. The Clerk is directed to enter judgment forthwith.

**NOTICE:** The judgment to be entered pursuant to this order is final. A dissatisfied party may appeal this Court's judgment to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

**SO ORDERED** this 31st day of May, 2016.

                                                  s/ William C. Griesbach
                                                  William C. Griesbach, Chief Judge
                                                  United States District Judge